**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

LAQUITA JO KEMPSTER,            )
                                )
    Plaintiff(s),            )
                                )
    vs.                      )        Case No. 4:21-CV-500 SRW
                                )
ANDREW M. SAUL,[1]              )
Commissioner of Social Security )
Administration,                 )
                                )
    Defendant(s).            )

**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court on review of an adverse ruling by the Social Security Administration. The Court has jurisdiction over the subject matter of this action under 42 U.S.C. § 405(g). The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. ECF No. 19. Defendant filed a Brief in Support of the Answer. ECF No. 23. Plaintiff did not file a Reply. The Court has reviewed the parties' briefs and the entire administrative record, including the transcripts and medical evidence. Based on the following, the Court will affirm the Commissioner's decision.

---

[1] At the time this case was filed, Andrew M. Saul was the Commissioner of Social Security. Kilolo Kijakazi became the Commissioner of Social Security on July 9, 2021. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name, and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Kilolo Kijakazi for Andrew M. Saul in this matter.

I.      **Factual and Procedural Background**

On June 17 and June 28, 2019,[2] Plaintiff Laquita Jo Kempster protectively filed an application for disability insurance benefits ("DIB") under Title II, 42 U.S.C. §§ 401, *et seq.*, and an application for supplemental security income (SSI) under Title XVI, 42 U.S.C. §§ 1381, *et seq.* Tr. 162-70. Plaintiff's applications were denied on initial consideration. Tr. 81-86. On August 14, 2019, she requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 87-90.

On April 23, 2020, Plaintiff appeared for a telephonic hearing with the assistance of counsel. Tr. 25-53. Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. *Id*. The ALJ also received testimony from vocational expert ("VE") Zacharia R. Langley. *Id*. at 47-52. On June 8, 2020, the ALJ issued an unfavorable decision finding Plaintiff not disabled. Tr. 10-20. Plaintiff filed a request for review of the ALJ's decision with the Appeals Council. Tr. 159-61. On February 25, 2021, the Appeals Council denied Plaintiff's request for review. Tr. 1-6. Accordingly, the ALJ's decision stands as the Commissioner's final decision.

With regard to Plaintiff's testimony, medical records, and work history, the Court accepts the facts as presented in the parties' respective statements of facts and responses. The Court will discuss specific facts relevant to the parties' arguments as needed in the discussion below.

---

[2] The ALJ indicated Plaintiff filed her applications on June 10 and June 14, 2019. Tr. 10. Review of the record, however, reflects the application for DIB was dated June 17, 2019, Tr. 162, and application for SSI was dated June 28, 2019. Tr. 164.

## II.     Legal Standard

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" § 1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability. 20 C.F.R. § 416.920(a)(1). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see whether the claimant has a severe impairment "which significantly limits claimant's physical or mental ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *see also* 20 C.F.R. § 416.920(a)(4)(ii). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively

disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined as the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011); *see also* 20 C.F.R. § 416.945(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC, and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work which exists in significant numbers in the national economy shifts to the Commissioner. *See Brock v. Astrue*,

574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work which exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Hensley*, 829 F.3d at 932.

If substantial evidence on the record as a whole supports the Commissioner's decision, the Court must affirm the decision. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. Under this test, the court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). The Court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id*. The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016).

## III.  The ALJ's Decision

Applying the foregoing five-step analysis, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through September 30, 2021. Tr. 12. Plaintiff has not engaged in substantial gainful activity since the alleged onset date of May 14, 2019. Tr. 13. Plaintiff has the severe impairments of T6 compression fracture, chronic diastolic congestive

heart failure, and degenerative disc disease of the lumbar spine. Tr. 13-14. Plaintiff does not have

an impairment or combination of impairments that meets or medically equals the severity of one

of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. Tr. 14-15. The ALJ found

Plaintiff had the following RFC through the date last insured:

> [Plaintiff] has the residual functional capacity to perform light work as defined in
> 20 CFR 404.1567(b) and 416.967(b) except she can only occasionally climb ramps
> and stairs and never climb ladders, ropes, or scaffolds. She can occasionally stoop,
> kneel, crouch, and crawl, but cannot work at unprotected heights, around moving
> mechanical parts or other such hazards.

Tr. 15. Plaintiff is unable to perform any past relevant work as a caregiver or nurse assistant. Tr.

18. The ALJ further found Plaintiff was born on September 29, 1978, and was 40 years old,

which is defined as a younger individual age 18-49, on the alleged disability onset date. *Id.*

Plaintiff has at least a high school education and is able to communicate in English. *Id.*

The ALJ determined the transferability of job skills is not material to the determination of

disability because the Medical-Vocational Rules supports a finding that Plaintiff is "not

disabled," whether or not Plaintiff has transferrable job skills. Tr. 19. Relying on the testimony

of the VE and considering Plaintiff's age, education, work experience, and RFC, the ALJ found

there were jobs existing in significant numbers in the national economy which the Plaintiff could

perform, including representative occupations such as cashier (*Dictionary of Occupational Titles*

("*DOT*") No. 211.462-010, with approximately 1,700,000 jobs nationally), fast food worker

(*DOT* No. 311.472-010, with approximately 1,500,000 jobs nationally), and cleaner/housekeeper

(*DOT* No. 323.687-014, with approximately 126,000 jobs nationally). *Id.* The ALJ concluded

Plaintiff has not been under a disability, as defined in the Social Security Act, from May 14,

2019, through the date of her decision, issued on June 8, 2020. *Id.*

## IV.     Discussion

Plaintiff argues the ALJ's RFC determination is not supported by substantial evidence because the record was not properly developed. ECF No. 19. Plaintiff asserts the record is devoid of an "opinion from a treating or examining source with respect to any specific, function-by-function restrictions on Plaintiff's ability to perform basic work activities as a result of her documented severe physical impairments" and an "opinion from a treating or examining source with respect to any mental limitations on Plaintiff's ability to perform basic work activities." *Id.* at 4. Plaintiff acknowledges the record contains opinions from non-examining state agents as to her physical and mental impairments, but argues those opinions "were of no probative value" because subsequent medical records documented additional symptoms. *Id.* Plaintiff contends the ALJ should have obtained "consultative examinations to assess the degree of limitations attributable to her physical and mental impairments." *Id.* at 5. Plaintiff further argues the ALJ erroneously relied on her own interpretation of the evidence, "pick[ing] and choos[ing] only evidence which support[ed] her position. *Id.*

In response, the Commissioner contends the ALJ did not err because the RFC was appropriately formulated and supported by substantial medical evidence. ECF No. 23. The Commissioner asserts the ALJ had no obligation to obtain consultative examinations because there was sufficient evidence in the record to adequately determine Plaintiff's level of functioning and to support the limitations in the RFC. The Commissioner further asserts the ALJ did not pick and choose records but, to the contrary, addressed all the relevant favorable and unfavorable evidence in the record.

### A. The ALJ's Evaluation of Plaintiff's Mental Impairments

The ALJ found Plaintiff's mental impairments of anxiety, depression, and posttraumatic stress disorder ("PTSD") to be non-severe, causing only mild limitations in her ability to perform basic mental work activities. Tr. 13. In making this determination, the ALJ considered Plaintiff's history of largely normal psychiatric findings, Plaintiff's own testimony describing her symptoms and limitations, an assessment from a non-examining state agency psychologist, improvement from medication, and her ability to perform activities of daily living. Tr. 13-14, 18.

On June 28, 2019, Plaintiff appeared for a new patient consult visit with Nurse Practitioner ("NP") Marshall Trawick with complaints of back pain. Plaintiff denied confusion and suicidal ideas, and was not nervous or anxious. Tr. 339. During a physical examination, NP Trawick described Plaintiff to have normal behavior, mood, affect, and thought content. Tr. 340. On July 3 and August 1, 2019, Plaintiff appeared for additional treatments due to back pain. Tr. 344, 540. The treatment notes from these visits again describe Plaintiff to have normal behavior, mood, affect, and thought content. Tr. 344, 540. The August 1 treatment note indicated she was prescribed Effexor[3] for generalized anxiety order, however, there was no description of her anxiety symptoms and this impairment was not listed as a chief complaint. Tr. 538-39, 541.

On August 8, 2019, non-examining state consultative agent, Kim Stalker, Psy.D., completed a Psychiatric Review Technique. Tr. 62-63, 72-73. Dr. Stalker opined that Plaintiff did not have any mental medically determinable impairments because the record, up to the date of her review, did not contain an official diagnosis for depression or PTSD, and treatment notes did not reflect any functional impairments. *Id.* The ALJ found Dr. Stalker's assessment to be partially persuasive because subsequent treatment records supported the presence of mental

---

[3] Effexor, or Venlafaxine, is used to treat depression and generalized anxiety disorder. *MedlinePlus*, available at https://medlineplus.gov/druginfo/meds/a694020.html (last visited April 18, 2022).

impairments with mild limitations. The ALJ then addressed all of the mental health records created after Dr. Stalker asserted her opinion.

On November 11, 2019, Plaintiff appeared for an office visit with her primary care physician with complaints of back pain and depression. Tr. 522. Plaintiff was observed to be nervous and anxious, but upon psychiatric examination she exhibited normal behavior, normal thought content, and normal judgment. Tr. 13, 534-44. She also reported improvement with her general anxiety as a result of the Effexor prescription. Tr. 13, 535. On January 15, 2020, treatment notes once again described Plaintiff to exhibit normal behavior, mood, affect, and thought content, and she continued to deny confusion, self-injury, and suicidal ideas. Tr. 13, 527-28.

Plaintiff appeared for a counseling and therapy session with Dr. Patrick Oruwari on March 27, 2020, and attended two follow up appointments on April 9 and April 17, 2020. Tr. 13, 642-70. At the first appointment, Dr. Oruwari noted that he last saw Plaintiff in October of 2012. Although the March 27 treatment record indicates a "generally normal" and "unremarkable" mental status exam, Tr. 651, the Court notes she tested positive for "moderate" depression, anxiety, and psychiatric symptoms, Tr. 649-50, and was marked to be a "medium risk" for suicide. Tr. 657. Plaintiff was prescribed Buspirone HCL.[4] Tr. 654. Her second therapy session revealed no additional symptoms, and she denied any thoughts of suicidal ideation. Tr. 642-45. In her third session she reported having a better mood, lessened anxiety, no depression, no active symptoms of PTSD, increased sleep, and medication efficacy. Tr. 660, 662. No other psychiatric treatment notes are included within the record.

---

[4] "Buspirone is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety. Buspirone is in a class of medications called anxiolytics. It works by changing the amounts of certain natural substances in the brain." *MedlinePlus*, available at https://medlineplus.gov/druginfo/meds/a688005.html (last visited April 18, 2022).

In evaluating Plaintiff's mental impairments, the ALJ further considered her Function

Report. Tr. 217-25. Plaintiff stated she was able to independently pay bills, count change, handle

a savings account, and use a checkbook, Tr. 220. She denied any issues getting along with others

or with authority figures, and indicated she spends time with others, including attendance at a

"grief group." Tr. 221. She confirmed she was never terminated from a job because of

interpersonal issues. Tr. 222. Plaintiff testified to deficiencies in focus and concentration, which

she attributed to depression and anxiety, and a propensity to avoid social activities because of

sadness due to her son's death in February 2019. Tr. 44-45, 221-22.

After review of the above records, the ALJ determined Plaintiff's mental impairments

were non-severe because she had no limitations in understanding, remembering, applying

information, interacting with others, or adapting and managing herself; and had only mild

limitations in concentrating, persisting, or maintaining pace. Tr. 13-14. The ALJ confirmed that,

despite finding her mental impairments non-severe, she did consider them in formulating

Plaintiff's RFC. Tr. 13.

Plaintiff argues the ALJ erred in determining her mental impairments to be non-severe

because she failed to obtain a consultative examination describing her function-by-function

abilities and limitations. The Court cannot agree. "While an ALJ does have a duty to develop the

record, this duty is not never-ending and an ALJ is not required to disprove every possible

impairment." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011) (citing *Barrett v. Shalala,* 38

F.3d 1019, 1023 (8th Cir. 1994)). "The ALJ is required to order medical examinations and

tests *only if* the medical records presented to him do not give sufficient medical evidence to

determine whether the claimant is disabled." *Id.* (citing *Conley v. Bowen,* 781 F.2d 143, 146 (8th

Cir. 1986)) (emphasis added). Further, "an ALJ is permitted to issue a decision without obtaining

additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Haley v. Massanari*, 258 F.3d 742, 749-50 (8th Cir. 2001) (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). Additionally, "reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." *Id.* at 749 (quoting *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995)).

In accordance with this framework, the regulations provide the following guidance for when a consultative examination may be purchased:

> (a) General. If we cannot get the information we need from your medical sources, we may decide to purchase a consultative examination . . . . Before purchasing a consultative examination, we will consider not only existing medical reports, but also the disability interview form containing your allegations as well as other pertinent evidence in your file.
>
> (b) Situations that may require a consultive examination. We may purchase a consultive examination to try and resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on your claim[.]

20 C.F.R. 416.919a. Therefore, the regulations instruct ALJs to purchase consultative examinations when the record contains insufficient evidence to reach a determination regarding a claimant's disability. *See Haley*, 258 F.3d at 749-50 (ALJ did not err by failing to order a consultative examination because "there was substantial evidence in the record to allow the ALJ to make an informed decision"). Although the ALJ has a basic obligation to develop the medical record, the claimant bears the burden of proving she is disabled and is responsible for producing evidence to support her claim. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The Court finds the record was sufficiently developed for the ALJ to make a disability determination without a consultative examination. As discussed above, the ALJ observed that Plaintiff's medical records consistently showed normal mental status examinations. The first

mention of her experiencing symptoms of depression to a treating physician during the relevant time period was on November 11, 2019, approximately five months after she submitted her disability applications. Tr. 533. However, as the ALJ noted, her psychiatric examination was normal on that date. Tr. 535. Subsequent treatment notes described Plaintiff to exhibit normal behavior, mood, affect, and thought content. Tr. 338-40, 344, 540. Plaintiff appeared for only three therapy appointments, on March 27, 2020, April 9, 2020, and April 17, 2020, Tr. 13, 642-70, and by the third session she reported having a better mood, lessened anxiety, no depression, no active symptoms of PTSD, increased sleep, and medication efficacy. Tr. 660, 662. In her Function Report she denied issues getting along with others, including authority figures, and she did not list mental impairments as a reason for why she cannot work. Tr. 44-45, 217, 221-22. Notably, treatment notes from August 1, 2019, November 11, 2019, and January 15, 2020, indicate she "is able to do all ADLs [activities of daily living]." Tr. 527, 533, 539. Plaintiff rarely sought mental health treatment, and there is no record of any in-patient care.

Thus, the Court cannot agree with Plaintiff that the ALJ committed reversible error in finding her mental impairments non-severe based on the available medical evidence in the record, or that the ALJ was required to obtain an additional opinion. *See Vanlue v. Astrue*, 2012 WL 4464797, at *12 (E.D. Mo. Sept. 26, 2012) (affirming ALJ's finding that depression was not a severe impairment where the claimant had sought only minimal and conservative treatment and the claimant never required more aggressive forms of mental health treatment than medication); *Stallings v. Colvin*, 2015 WL 1781407, at *3 (W.D. Mo. Apr. 20, 2015) (citing *Tellez v. Barnhart*, 403 F.3d 953, 956-57 (8th Cir. 2005)) ("Eighth Circuit case law reveals that an ALJ can appropriately determine a claimant's RFC without a specific medical opinion so long as there is sufficient medical evidence in the record.").

**B. The ALJ's Evaluation of Plaintiff's Physical Impairments**

In evaluating Plaintiff's physical impairments, the ALJ first summarized the hearing testimony. Tr. 15-16, 37-47. Plaintiff testified to constant back pain, daily muscle spasms, and leg numbness. Tr. 37-39. She stated she cannot lift more than three or four pounds, sit for more than eight to fifteen minutes, stand for more than ten minutes, walk for more than three to five minutes, and cannot get out of bed several times per week. Tr. 39-40. She testified to having difficulties bending down, kneeling, and navigating stairs. Tr. 41. She stated muscle relaxers reduce her pain, but her blood pressure medication causes dizziness and headaches. Tr. 38, 42. She further testified that her heart does "not contract[] like it should," which causes chest pains, and she has "fibromyalgia or something" in her shoulders. Tr. 43. She stated she "can pretty much move [her] hands and stuff," although her fingers occasionally swell. *Id.* Plaintiff testified to having a driver's license, but being unable to drive, and relying on her son to grocery shop and her ex-mother-in-law to bathe her. Tr. 45-46.

The ALJ found Plaintiff's "impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of the[] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 16. The ALJ explained:

> As for the [Plaintiff's] statements about the intensity, persistence, and limiting effects of . . . her symptoms, her course of treatment has been rather conservative, with few objective findings to support the severity of symptom[s] she alleged with respect to limitations in walking, standing, sitting, and lifting or alleged headaches. As for her back conditions, she has exhibited tenderness, but generally her range of motion testing and gait have been normal and she has denied weakness. Moreover, she routinely reported that her pain medication, Norco, is effective and that she did not need to use it often. She reported to her treating physician that she was independent in her activities of daily living. There are no objective findings to support her alleged inability to move on some days. While she was observed with swelling following a motor vehicle accident, subsequent treatment records do not support the [Plaintiff's] alleged edema or need to elevate

her legs. The record overall supports the claimant can perform light exertional work with additional postural and environmental limitations.

*Id.*

The Court finds it significant that the ALJ summarized every relevant treatment note within the record to formulate Plaintiff's RFC. On August 14, 2018, Plaintiff visited with her treating provider, Dr. Jamesy Charles Smith, complaining of neck and shoulder spasms. Tr. 16, 287-88. The ALJ noted she was provided with a conservative treatment recommendation to begin Methocarbamol,[5] apply heat, stretch, and take Tylenol as needed. Tr. 16, 288. On January 17, 2019, a lumbar spine MRI revealed no fractures, unremarkable L1-L2 3 disc space, "very minimal disc bulge" in the L3-L4 with no stenosis, and narrowed L4-L5 with no significant disc bulge or stenosis. Tr. 16, 431-32. The overall impression was described as: "Degenerative changes predominately L5-S1 otherwise unremarkable study." Tr. 432.

Plaintiff was involved in a motor vehicle accident on May 14, 2019, her alleged onset date, and sought treatment the same day. Tr. 16, 413-27. Despite complaints of tenderness in her thoracic spine, Plaintiff was ambulatory upon arrival to the emergency room and had normal imaging results. Tr. 413, 417, 423-27. She was described to have a contusion of the chest wall, a cervical strain, and a strain of the thoracic back region. Tr. 417. She was discharged with the direction to use ice and take anti-inflammatory and muscle relaxant medications. *Id.*

On June 28, 2019, Plaintiff appeared as a new patient at Saint Francis Medical Center with complaints of back pain, which she described as an 8 out of 10. Tr. 16, 338-40. She stated her pain began one year prior due to a "traumatic incident." Tr. 338. She reported the pain to worsen with activity, but denied upper or lower extremity weakness or difficulties walking. *Id.*

---

[5] Methocarbamol, or Robaxin, is a muscle relaxant and is typically "used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." *MedlinePlus*, available at https://medlineplus.gov/druginfo/meds/a682579.html (last visited April 18, 2022).

Upon examination, she had normal range of motion. Tr. 339. A CT of the thoracic spine revealed a "[c]ompression fracture T6 with approximately 80% loss of vertebral body height anterior and approximately 60% loss of vertebral body height posteriorly." Tr. 340. NP Trawick recommended she use a back brace "[t]o reduce pain by restricting mobility of the spine." Tr. 341.

The Court notes that Plaintiff's Function Report, which she completed approximately two weeks after her appointment at Saint Francis Medical Center, contradicted her statements regarding her symptoms. *See* Tr. 217-25. As stated above, Plaintiff told NP Trawick she had no issues walking and denied any weakness in her upper or lower extremities. Tr. 338. However, Plaintiff wrote in her Function Report that she required "help with walking," Tr. 220, needed to rest for 5 to 7 minutes after taking only 7 to 10 steps, Tr. 222, and could not lift her arms over her head. Tr. 218.

On July 3, 2019, Plaintiff reported her back pain to be "moderate" and "gradually improving since onset." Tr. 16, 343. A physical examination revealed back tenderness with normal range of motion. Tr. 344. A July 13, 2019, thoracic spine MRI revealed a "probable chronic compression fracture at T6" but was "otherwise negative." Tr. 16, 347-48. On August 1, 2019, treatment notes indicated she was taking Norco[6] for the chronic compression fracture and lumbar pain but also noted her "pain [wa]s controlled fair to good depending on activity level and weather changes." Tr. 17, 539. Significantly, her provider further indicated her back pain was a "non-surgical" issue at this point, she was able to perform all necessary activities of daily living, and was able to "get some rest at night." Tr. 17, 538-39. Plaintiff denied side effects from

---

[6] Norco is a combination of Hydrocodone and Acetaminophen used to relieve pain. *Mayo Clinic*, available at https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral-route/description/drg-20074089 (last visited April 18, 2022).

Norco. Tr. 17, 539. Her overall pain was described as "mild," and she exhibited a normal range of motion. Tr. 540. On November 11, 2019 and January 15, 2020, Plaintiff's pain continued to be described as controlled, she reported she could still perform necessary activities of daily living, and she denied side effects from Norco. Tr. 17, 533, 527. On the January 15 visit, she was referred to pain management. Tr. 530.

On February 11, 2020, Plaintiff appeared for a neurosurgical evaluation for treatment of back pain and intermittent numbness in her left leg. Tr. 17, 583. Upon physical examination she was noted to ambulate without difficulty, including heel-to-toe, and had mild kyphosis with tenderness in her mid-thoracic and lumbar regions. Tr. 584. She was ordered to undergo some radiological exams and to follow up in one month. Tr. 17, 585. The Court notes that during this visit she denied any difficulties getting dressed, bathing, or grooming. Tr. 590. These denials are contrary to Plaintiff's representations to the Social Security Administration, in which she stated she needs help getting out of bed and washing her hair and body. *See* Tr. 45-46, 218.

Plaintiff visited with a pain management specialist on March 12, 2020. Tr. 17, 629-33. Her conditions were described as cervical muscle pain, lumbar spondylosis, and thoracic spine compression. Tr. 629. Plaintiff reported she only took Norco when her pain was very severe, and a 90-day bottle typically lasted her several months. Tr. 630. A physical examination revealed a normal gait, decreased range of motion in her cervical spine, tenderness in her mid to upper thoracic spine, and normal lordosis in her lumber spine with tenderness and pain with extension. Tr. 633. Her extremities were negative for edema. *Id.* Plaintiff consented to and received a trigger point injection for pain reduction. Tr. 630. Due the Covid-19 pandemic, Plaintiff agreed to a virtual appointment for her second visit on April 16, 2020, and reported the injection "helped briefly." Tr. 635, 638.

16

Although Plaintiff testified her blood pressure medication and Norco makes her dizzy, Tr. 41-42, the record does not reflect her report of such side effects to her prescribing physician. To the contrary, Plaintiff consistently and explicitly reported no issues with her Norco. *See* Tr. 527, 533, 539. She also frequently denied any symptoms of dizziness. *See* Tr. 339, 413, 416, 448, 528, 649, 650, 656, 660, 667.

As to Plaintiff's congestive heart failure diagnosis, the ALJ noted "the record shows few complaints of related limitations and mostly normal findings." Tr. 17. On May 22, 2019, Plaintiff appeared to the emergency room due to facial/leg swelling and shortness of breath. Tr. 17, 353. Plaintiff was admitted due to suspected pneumonia and concern for heart failure. Tr. 357. Radiological exams revealed "minimal pleural effusion left lung base otherwise negative" and "mild congestive heart failure." Tr. 384. Plaintiff was discharged on May 24, 2019. Tr. 378-79.

Plaintiff complained of continued chest pain on June 23, 2019. Tr. 17, 292. Upon physical exam she had a normal heart rate, regular rhythm, and normal heart sounds with no murmur or respiratory distress. Tr. 300. Her electrocardiogram also revealed normal results. Tr. 307. The ALJ noted she subsequently denied chest pain on June 28, 2019, July 3, 2019, January 15, 2020, March 12, 2020, and April 16, 2020. Tr. 339, 343, 527, 632, 638. She had normal cardiovascular examinations on August 1 and November 11, 2019. Tr. 534, 540. Moreover, despite testifying to headaches "at least five out of seven days," Tr. 42, she regularly denied headaches to her treating providers. *See* Tr. 17, 339, 343-44, 365, 527-28, 534, 540, 618, 649-50, 656, 660.

On April 7, 2020, Plaintiff appeared to Dr. Farhaan Ahmad to establish cardiovascular care. Tr. 616-621. Plaintiff complained of "increasing dyspnea with associated chest heaviness and tightness." Tr. 17, 616. Her physical exam revealed normal results, including a normal heart

rate and rhythm, and no murmurs. Tr. 619. An echocardiogram was ordered, which did not

reflect any abnormal conclusions. Tr. 17, 672-74. Less than a month later, on April 16, 2020,

Plaintiff denied chest pain. Tr. 18, 638.

In addition to the above records, the ALJ considered the RFC opinion of non-examining

state agent, Dr. Michael O'Day, which was submitted on August 14, 2019. Tr. 64-66. Dr. O'Day

opined that Plaintiff could perform light work as she could occasionally lift and/or carry 20

pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of 6 hours in an 8-

hour workday; and push and/or pull without limitation. Tr. 64. He indicated Plaintiff did not have

any postural, manipulative, visual, or communicative limitations, but did need to avoid

concentrated exposure to hazards, such as machinery and heights. Tr. 64-65. The ALJ found Dr.

O'Day's opinion to be somewhat persuasive, but determined that "newer evidence support[ed]

further limitations" as reflected by the RFC. Tr. 18.

Plaintiff argues her physical RFC was not supported by substantial evidence because the

ALJ should have sought a new opinion as to her function-by-function limitations. Plaintiff

contends Dr. O'Day's opinion was not probative evidence of her RFC because subsequent

medical records supported additional physical limitations than what Dr. O'Day initially

described. While the Court acknowledges additional medical records were created between

August 14, 2019, the date Dr. O'Day submitted his RFC opinion, and June 8, 2020, the date of

the ALJ's opinion, the Court cannot agree that the ALJ needed to obtain a new RFC assessment

opinion or a consultative examination.

The ALJ must "develop the record fairly and fully, independent of the claimant's burden

to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). However, an ALJ need

not obtain additional or clarifying statements unless a critical issue is undeveloped. *See Goff v.*

*Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Warburton v. Apfel*, 188 F.3d 1047, 1051 (8th Cir. 1999) (citation and internal quotation marks omitted). To demonstrate the ALJ failed in adequately developing the record, a plaintiff must show that the error resulted in some prejudice. *Haley*, 258 F.3d at 750.

The mere fact that Dr. O'Day's RFC assessment was written almost one year before the issuance of the ALJ's opinion does not necessarily render it unworthy of probative value. *See, e.g., Bollinger o.b.o Bollinger v. Saul*, 2020 WL 4732042, at *3 (E.D. Mo. Aug. 14, 2020) (finding a 2-year-old opinion valid evidence since there was "no objective medical evidence in the record" showing "a marked change in condition" after the opinion); *Sullins v. Astrue*, 2011 WL 4055943, at *6 (E.D. Mo. Sept. 6, 2011) (finding an opinion covered "a relevant time period" though it was over one-year old).

Dr. O'Day's opinion that Plaintiff was not disabled and could perform a limited range of light work is consistent with post-August 2019 records showing she could accomplish necessary activities of daily living, did not complain of medication side effects, and had generally normal physical examinations. The record contained, and the ALJ considered, not just Dr. O'Day's opinion, but also all the relevant documentation from Plaintiff's treating physicians, including radiological and echocardiogram test results, and Plaintiff's own testimony. Indeed, the ALJ specifically found Dr. O'Day's light RFC determination to be consistent with later records, except that additional limitations would need to be applied. *See Zeier v. Colvin*, 2016 WL 1068995, at *9 (E.D. Mo. Feb. 26, 2016), report and recommendation adopted, 2016 WL 1060371 (E.D. Mo. Mar. 17, 2016) (ALJ did not err when adding limitations to state agents RFC

assessment). The ALJ cited to most, if not all, of the relevant underlying record. Because the record was sufficient for the ALJ to determine that Plaintiff could perform light work and no crucial issue appears to be undeveloped, the Court cannot find that the ALJ had an obligation to obtain an additional RFC assessment or purchase a consultative examination. 20 C.F.R. §§ 404.1512(e), 404.1527(c)(3); 416.912(e), 416.927(c)(3).

Thus, the Court finds Plaintiff's arguments regarding his physical impairments are without merit as the record was fairly and fully developed, and substantial evidence in the record as a whole supports the ALJ's decision. "If substantial evidence supports the decision, then we may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if we may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). The ALJ considered Plaintiff's subjective allegations of pain and the totality of the medical record when determining Plaintiff's RFC. The ALJ properly found Plaintiff was able to meet the physical demands of light work with certain limitations during the relevant time period.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and

Plaintiff Laquita Jo Kempster's Complaint is **DISMISSED, with prejudice**. A separate

judgment will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that the Clerk of Court shall substitute Kilolo Kijakazi

for Andrew M. Saul in the court record of this case.

So Ordered this 21st day of April, 2022.

STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE